Next case in our docket is 21-20394, in the matter of C.J. Holden Company. Ms. Crozier? Good morning. May it please the Court. My name is Christina Crozier, and I'm arguing on behalf of all three appellants, Neighbors Corporate Services, the Reorganized Debtors, and Conway McKenzie as the unsecured claims representative. This bankruptcy appeal concerns whether 67 individuals, all of whom had notice of the bar date, could file proofs of claim nearly three years late. That question turns on whether the 67 late plaintiffs can establish excusable neglect under the four pioneer factors established by the U.S. Supreme Court. The bankruptcy court in this case, understanding the full impact that these 67 new claims would have, found that none of the pioneer factors were established and that there was no excusable neglect. The district court reversed and reached different findings on every single pioneer factor. The bankruptcy court's factual findings were well-reasoned and should stand under the clear error standard of review. To begin, I think it's helpful to discuss two principles that I think will permeate this argument, and the first is that it's the plaintiffs who have the burden to provide evidence of excusable neglect. It's not the estate party's burden to negate excusable neglect. The second principle is that inadvertence, ignorance of the rules, and ignorance about a misconstruction of the rules also generally does not establish excusable neglect under pioneer and under this court's authority. The evidence before the bankruptcy court pointed strongly that the prolonged delay was caused by inadvertence or misconstruction of the bankruptcy rules, and so the evidence showed that there was no excusable neglect. I'm going to walk the court now through the pioneer factors, and I'll begin with the length of delay factor. Courts have held that when measuring this factor, you begin with the bar date and you end with the date on which the plaintiff filed the motion for leave to file the late proof of claim, and in this case, the time that lapsed between those two points was remarkably long. It was two years and nine months. The plaintiffs have not pointed to a single case in which excusable neglect was found when there was such a long delay, and this court's own precedent have found that there was no excusable neglect under substantially shorter time periods. So in NRA DHL, this court found that there was no excusable neglect when a party filed its proof of claim 42 days late, and then in NRA Value Part, Judge Clement and Judge Ingleheart, you had found that there was no excusable neglect when the parties filed their proof of claim one year late. Here we have a delay that was nearly three times that. So looking just to the length of delay, the bankruptcy court did not clearly err by finding that the length did not establish excusable neglect. The next pioneer factor is the reason for delay, and it's helpful to start here with the fact that the 67 late plaintiffs all had notice of the bar date before the bar date. It's also helpful to note that 29 plaintiffs, many of whom are represented by the same counsel who represents the 67 late filing claims, they filed individual proofs of claim. So there was no question that the plaintiffs had the ability to file proofs of claim, they just didn't. To justify their delay, the plaintiffs appointed to numerous events during this two-year, nine-month period, which they say confused them into delaying filing these proofs of claim. First, they say that the 15-month period that spanned between the bar date and the Ninth Circuit's opinion, during that time they were confused because they believed that their class proofs of claim would preserve their rights. And that belief was not reasonable for several reasons. First, the plaintiffs knew for more than one year that the class was challenged. The Ninth Circuit appeal was pending for more than a year before the bar date. The second reason is that this circuit has never actually recognized class proofs of claim. That's still an open question in this circuit. And this court doesn't actually have to reach that question here, because those courts that have found that class proofs of claim are valid have found that you first have to go to the bankruptcy court and file a motion to apply Rule 23. And that just didn't happen here. So even if we assume that class proofs of claim are valid in the Fifth Circuit, the late-filing plaintiffs did not follow the procedure that is necessary to make that happen in the bankruptcy court. The plaintiffs also say that their delay in the period between the Ninth Circuit opinion and the day in which they filed their motion for leave to file motion late proofs of claim, and that was an 18-month span, they say that that delay was caused by the estate party's willingness to mediate. There was a seven-month period between May 2018 and December 2018 in which the parties began talking about mediation. That mediation didn't occur until December 2018. So whenever these discussions, even the discussions talking about mediation, occurred, that was in May 2018, a year and a half after the bar date. So it can't be said that the plaintiffs were misled into believing they didn't have to file proofs of claim because of the mediation. And that really differentiates this case from Eagle Bus, that differentiates this case from North Star. In those cases, we had ADR mediation that was occurring around the time of the bar date. And in those cases, the plaintiffs were reasonably confused about whether a proof of claim was necessary. Here, the December 2018 mediation did not occur until two years after the bar date, and it offered no excuse. The next factor I'd like to address is prejudice. The bankruptcy court in this case correctly understood that the prejudice extended well beyond the monetary impact on the reorganized debtors. And that impact could be quite significant, but the court understood it's more than that. The greatest prejudice here is that these 67 new proofs of claim could threaten very All of these new proofs of claim would have to be individually arbitrated. And so there was a real threat that the bankruptcy court recognized that these claims could prevent the bankruptcy from closing. There's evidence in the record to that effect. Greg Gallimore, who is in-house counsel for the reorganized debtors, testified that they thought they were nearing the end of the bankruptcy and that these new cases threatened the ability to close the bankruptcy. And that testimony is uncontroverted. So even though it's not the state party's burden to show excuse for neglect, that testimony is out there and uncontroverted. So what's the fact of just simply extending the bankruptcy to cover these claims? What's the practical effect of that? Right. So it has effect on the reorganized debtors, for one thing. These folks have done what they're supposed to do to get through the bankruptcy and get their organizations to the other side of bankruptcy. Just being in a bankruptcy is obviously not a great place for an organization, and they've taken the steps to efficiently get through it. And so it would punish them, but it also punishes the unsecured creditors. These are the folks who did what they were supposed to do. They filed their proofs of claim on time, and they've been waiting for final distributions, and they can't receive those final distributions until all of the cases in the bankruptcy are wrapped up and the bankruptcy is closed. Would the admission of these claims, if they are part of the bankruptcy, would they dilute the financial distribution, or would they be considered part of money that had already been attributed to this group of claimants? As to the monetary aspect, there's an indemnity. Neighbors has agreed to indemnify the reorganized debtors in the unsecured claims pool. So if the indemnity stands, and keep in mind, this could stretch this out for years. So right now, we're in a position where the indemnity has absolutely been obligated. The concern of the unsecured creditors representative is that if we stretch this out for years and we triple the number of plaintiffs, they simply don't know what's going to happen next. So if the indemnity stands, then it shouldn't affect the unsecured creditor pool. If the indemnity did not stand, the unsecured creditor pool is estimated to probably be depleted by about 50%. I'd like to address for a moment the district court's conclusion that the estate parties expected these 67 new proofs of claim, and therefore were not prejudiced. That's really a misconstruction of the facts here. The estate parties did expect the WW litigation. That's true. They didn't expect the number of claimants to be tripled. And the first time we had any notice of that was in May 2018, when the arbitration demands started to be filed. So that was a year and a half after the bar date. So it's a significant change. It's something that the reorganized debtors didn't factor in when they were negotiating and confirming their plan. And the same with the unsecured creditors. That's something that they were unable to factor in when they were negotiating and confirming the plan. So it is a significant difference. So this isn't a case like Eagle Bus, where the parties knew about the scope of the claims and went ahead and mediated, and therefore they had notice. The estate parties in this case really didn't have any kind of notice until a year and a half later. The other thing I'd like to address briefly is the agreed order. The other side has argued and the district court raised in its opinion that perhaps the agreed order created some confusion about whether proofs of claim were necessary. And I want to be clear that the agreed order just pertained to the automatic stay or the plan injunction. And it lifted the stay and the plan injunction as to the WW litigation. However, it in no way allowed the parties to get around the bankruptcy rules or expand the class beyond what was contemplated. The last factor I want to discuss is good faith. And again, it was the plaintiff's burden to establish good faith. It was not the estate party's burden to show bad faith. And courts have held that failure to be diligent and indifference to bankruptcy rules can show a lack of good faith. And that's really what we have here. Viewed most generously, the actions of the plaintiffs can be construed as a lack of diligence or perhaps an indifference or misconstruction of the rules. And so the evidence tips in favor of showing a lack of good faith. With that, if the court doesn't have any further questions for now, I can give my time back until rebuttal. Thank you. May it please the court. My name is Richard Donahue, and I represent the appellees, the West Wilmington Oilfield Claimants, and I represented them below and in the California litigation. The district court's decision should be affirmed because the district court correctly identified the lower court's error in failing to consider the totality of the circumstances. Do you agree that what the district court should have been reviewing for was abusive discretion? I believe that the district court should not have been reviewing on abusive discretion, but for clear error, and that the district court had the same standard of review as this court, but that the district court's opinion should not be ignored. I'm not sure I understand. Then I didn't understand your question. This is an appeal from the bankruptcy court to the district court on the question of whether a standard is established. Do you agree that the district court should apply an abusive discretion standard in reviewing the bankruptcy court's determination on excusable neglect? I believe that the district court's standard is acting as an appellate court to where the district court's decision should be affirmed. Do you agree that the district court should not have been reviewing on abusive discretion? I think the court did abuse its discretion, but I believe that Judge Rosenthal applied the standard of review that is set forth in this circuit's rulings on excusable neglect and applying those factors. That is an abusive discretion standard. That's all I'm asking. I would agree that that is an abusive discretion standard. Your brief wasn't clear about that. I think she applied the correct standard, which is the standard that this court applies. In addition to identifying those errors in lack of considering the totality, she actually applied those pioneer factors in this unique case with these unique procedural circumstances. Can I ask you? Sure. It seems to be an obvious question. Why did some 27 folks involved in this file claims and the rest of the 60, however many others, didn't? I understand what was going on in the Ninth Circuit, but some did and some didn't. The majority didn't. Number one, why is that? Number two, shouldn't we factor that in when we decide whether neglect was excusable? As to the first question, as you'll see in the record, this project that the workers were working on, this project in Long Beach, which occurred 2012 to 2014, finished. In 2015, shortly before this filing of bankruptcy, Neighbors Completion and Production merged with C&J Holdings. Many, if not most, of these workers did not work for C&J Holdings and had left Neighbors prior to that. They get something in the mail that says C&J Holdings. They're not employed by C&J Holdings and they likely did not understand what it was. Some filed proofs of claim and we did not have the contact information for all the putative classmates. Is there any distinguishing feature to a man or woman, as the case may be, between those that did file and those that didn't, where we could say, well, the ones who filed timely, that's great, but the ones who didn't, they should get special consideration or their neglect was excusable under the pioneer standard. How do we make that distinction in order that we can put the ones who filed timely to the side and say, let's focus on those who didn't, which is really what our case is about today? Well, the other factor, to answer your question, there isn't a distinguishing factor except to say that the issue that's overriding that we've been litigating in California has been whether or not a certain prevailing wage law applied to this work. So the other factor is whether or not the individual who got a notice knew they even had a claim. It is totally different from saying, I think I'm right to be a part of this class and I don't have to file because I'm a class member versus I don't even know about the bankruptcy. That does not explain why these people didn't know anything. And some did. You can take my point. It's not that they were relying on being part of some class and waiting to see what the Ninth Circuit said, it doesn't seem. It's that they didn't even know about the bankruptcy. If that makes sense. Understood. And that is why when we looked at it, we, albeit mistakenly, thought that if we didn't get certified and we had a certified, certifiable class, a discrete project, a discrete couple of 154 workers, although we didn't have their names, we knew the approximate size. And we had the real bar to class certification having already been decided by the district court in Los Angeles with findings of fact on this class action waiver. So we looked at the authorities, we looked at TWL, we mistakenly believed that if for some reason it wouldn't be certified, that those individuals would be able to file late proofs of claim under the equitable doctrines. And as we proceeded with, but that overlays into the four factors, which I would like to address briefly while I have the time. Let me ask you before, did they all have the same lawyer? They didn't all have the same. Well, I represented some, and those who asked to file an individual claim, we did. But ultimately, we represent all of the 67, which engaged us over time. At the time of 2018, when the Ninth Circuit ruled, we represented all of the 67. That's why it's hard to understand why 29 filed, but the rest didn't, if they all had the same lawyer. Well, not at that time. Okay. And so, with respect to those who wanted to file an individual claim, that was done. But I'd like to... But what about their argument that notwithstanding what was going on at the Ninth Circuit, you would have had to file a class claim in the bankruptcy proceeding, and that was never done? No, we filed the class claim in the bankruptcy proceeding. And that's why the central issue here and the central inquiry in Pioneer is whether there's prejudice to the debtor, not to neighbors, counsel, not to neighbors. Neighbors is the indemnitore. Neighbors was the prior employer. And neighbors agreed to indemnify the debtor. And so that's why there is no prejudice here. In fact, as the record shows, this isn't like the Enron case where there was a little line in voluminous pages of a potential claim. I communicated directly to debtors' counsel, the subsequent employers, C and J, a month before the bar date and gave them a copy of the class action complaint. This is all in the record in my declaration. It is Exhibits 4 through 6 of my declaration. I provided them copies of the complaint, and then I communicated we'd be filing a class claim, that 10 individuals wanted to file an individual claim. We had communications about that before the bar date. More importantly, in the Statement of Affairs filed by C and J, the debtor, this claim was listed in their Statement of Financial Affairs of the ongoing litigation in California. We filed a class action claim. We submitted that as required under the bankruptcy rules, and we submitted that. Within two days, I'm communicating further with the counsel for the debtor because this month prior, we've been having communications, and they're telling us that neighbors, the prior employer, has indemnified the claim. We're discussing how to stipulate to remove the claim from the bankruptcy with relief from stay. Within two days of the bar date, after we filed the class claim, we continued that negotiation, finally filing a motion, and then agreeing in this agreed-upon order, which was entered on February 1, 2017, signed by the bankruptcy judge that took the case, the Ridgway class action, for Mr. Ridgway and Smith for both their class claims and their individual claims  in California. And that was something that neighbors did not object to because neighbors, again, the indemnitor, got two things adjudicated, at least, by the Ninth Circuit, which is whether the class action waiver would preclude a class. So the Rule 23 issue was there. And then— You keep saying that they're the indemnitor, and I understand that as the case was brief, but doesn't the indemnitor—isn't the indemnitor entitled to any defenses of the indemnity in this case, including some procedural—let's say the claims were not—forget the bankruptcy, they were just not timely brought under a statute of limitations. The indemnitor could assert the claims of the indemnity, couldn't they, whether it's a bar date in bankruptcy or whether it's a statute of limitations or whatever defense? Great point. They got that—neighbors, the indemnitor got that right in a post-bar date mediation with the debtor. So the bar date happens in November of 16. Neighbors goes and mediates with C&J. Neighbors gets to be a released party being able to assert these objections, but it has to continue its indemnitor obligations, which they continue to do. That mediated settlement agreement was incorporated into the planned confirmation. And why that's important is because the cases that interpret prejudice, which Pioneer says is the central inquiry, the cases that interpret that say if it's post-confirmation, there really isn't much of an effect. The effect is minimal. So here in this case, before confirmation, I am providing the class claim. I'm making a class claim. I'm communicating with the lead counsel about it. I'm attempting to negotiate this stipulation for relief to go forward outside bankruptcy with the indemnitor. They mediate. They mediate whether they will continue to indemnify. And then there's one other point. In case the indemnification fails, counsel said that there was some risk to dilution. There isn't because the reserve that was made in the bankruptcy, and this is in the record and the district court talks about it in the opinion, there's a reserve of $28 million that was reserved for this case in the event that neighbors didn't complete its indemnity obligations. So there is no prejudice either to the debtor or to the creditors. And whether there would be or not was all baked into the confirmation plan, which the creditors had before then when that happened. And so on this central issue of prejudice, there is no prejudice either to neighbors or to the debtor. And the evidence, and I think that's what I would... Why did the bankruptcy judge miss that? It would seem the bankruptcy judge would appreciate that more than anybody. What accounts for that? The bankruptcy court did not consider my declaration. In the record at page... I submitted a 27-page declaration with all of the exhibits that I'm discussing, and the bankruptcy court believed that an attorney's declaration, even regarding the diligence and how it proceeded, that it should not be permitted. And that's at the record at 8648. If you read the bankruptcy court's transcript, he had difficulty with the fact that I was filing a declaration with this undue diligence. Certainly the bankruptcy court should have appreciated what was, as you put it, baked into the plan. And in addition to that, as the district court noted, Mr. Gallimore testified for the debtor, and he confirmed that they had no indications that neighbors would not continue to indemnify its indemnity obligations. And, in fact, in the record... And, again, there's no opinion where the bankruptcy court's cites to any evidence in the record look the way that Judge Rosenthal did, but in the transcript, it was simply that there might be prejudice to the debtor. And, clearly, that was speculation. You said there was $28 million in reserve that neighbors... In the event that neighbors didn't complete the indemnity obligation, where's that? Why didn't the bankruptcy court get that? He... Was that brought to the bankruptcy court? Yeah, that was in the record, and that was in the pleadings and argued below. I mean, there's been no... That's always been there. As a matter of fact, the bankruptcy court approved the reserve. In other words, the bankruptcy court, in the bankruptcy, orders the parties to estimate the reserves and then approves that. And so there is no prejudice. But the agreed-upon order lifting the stay for both the class claims and the putative class claims didn't get adjudicated or was entered in 2017. And when we got the ruling from the Ninth Circuit, we believed, based upon the wording of this agreed-upon order, that we could file individual arbitrations on behalf of all of the claimants, which we did because the agreed-upon order did not address this issue of a late filed or individual claim. While it reserved issue as to the validity of the class claim, it was silent on whether individuals who had not filed one could proceed with their arbitration. And so the first time that neighbors, the indemnitor, the first time that they raised this issue was at a status conference about a month after we filed the individual arbitrations because we were still litigating the PAGA claim, which is now the representative action in California. And they filed in a status conference report stating that they intended to object on that ground. And of note, they had never, in the bankruptcy, even though they were a release party, they had never filed any objection based upon that, and that was two years before. And as soon as that came up, as set forth in my declaration, which again wasn't considered the next day, I called counsel's partner from Haynes & Boone to discuss that issue when they said, well, let's mediate all these claims and all these issues before a mediator who understands bankruptcy. And we agreed to do that, but they would only mediate with their chosen mediator, and that's in the emails, in the exhibits. They would only do it with a bankruptcy mediator and only a certain person, Mr. Ross from San Francisco, and he was not available until December of 2018. And so they wanted to stop all litigation, stop anything in the bankruptcy, stop everything, and only focus on the mediation. We agreed to do that, not understanding that they would then come after and use that against us with respect to that. Was it clear at that point that they were saying it's too late to file claims? No, that's the first time in May of 2018. So even then you didn't file the claims. Well, we better file them now, so take that issue off. Right. They wanted to, as set forth in the emails in my declaration, they wanted to stop and mediate those issues too. File a stop time agreement? We did not do that, but what we did do was work with them for six months to liquidate, as best we could, every one of those claims. They produced the payroll data, electronic payroll data, for every one of the 90-some workers for every day of their work on this project. We engaged an expert. As set forth in the bankruptcy record attached to my declaration, redacted, of course, was the individual damage analysis showing all the workers' names in the damage analysis that we provided. At my request, we met with counsel Haynes and Boones in their offices three weeks before the mediation to present every bit of information we have, including the damage analysis, to liquidate these claims in mediation. We acted in good faith at all times. The mediation was unsuccessful, fantastically unsuccessful, and the report date was required by the bankruptcy judge. Oh, by the way, right on the eve of mediation, or about 45 days before the mediation, neighbors finally filed an objection based upon this issue. They filed the objection and with an emergency motion to abate it. So they wanted to not have their objection to this issue heard until completion of mediation, and that's in the record. And so they don't want any more bankruptcy litigation. They want to mediate it. They don't want their objection to be heard. On January 20th was the deadline to tell Judge Jones that the mediation was unsuccessful. After that date was set forth in my declaration, I tried to engage in a stipulation to try to resolve these issues. It was, quote, a nonstarter. On February 21st, looking at this, we filed the first motion with Judge Jones in order to say, does this agreed-upon order that is silent on this issue allow individual claim arbitrations to proceed? We had stopped doing anything in the arbitrations because we didn't want to violate Judge Jones' order. I filed that on February 21st of 2019. There was not a hearing until July 19th of 2019. In the meantime, neighbors teed up its objection that's brought us here today, and that's why he heard it on July 19th of 2019. So for that five months, we're waiting for now this first motion on this agreed-upon order, and on July 19th, he ruled that the effects of a class claim that was filed would not be given the effect. But he said it was without prejudice to a motion to file late-filed claims for these 67, which we filed within a month. And so for those reasons, while the length was a long time, what the cases like Pioneer say, like Eagle Bus says, it is elastic and it needs to be considered of what was going on. We've got your argument. All right. Thank you very much. Thank you. I'd like to address just a few points made by counsel for the plaintiffs. The first, on the issue of the reason for delay, it was represented that the plaintiffs filed a motion to apply Rule 23 in the bankruptcy court, and that simply did not happen, and that's not in the record. Also, it was represented that they did not have a notice that we had objections to the proofs of claim until May 2018. That also is not the case. The agreed order, which was entered February 1st, 2017, the estate parties specifically reserved their right to object to the class proofs of claim. On the issue of prejudice, it's incorrect to say that there's less prejudice after a plan is confirmed. It's quite the opposite, and that's because the debtors and the creditors rely on the number of claims when they're negotiating and confirming the plan. And so if you begin making changes, especially like where we have here, where the class is tripled, that absolutely prejudices the creditors and the debtors. What about the $28 million reserve? The reserve, actually, it was calculated on that amount. However, I believe it was only 3%. The unsecured claims representative has assured us that if NABUR was to not indemnify, that poll would be diminished by roughly half, and that's an estimate, notwithstanding the reserve. Your Honor, those are the main points I wanted to hit. Does the court have any further questions for me? No. Thank you very much. With that, I'd like to conclude by saying that the bankruptcy court was correct in its reasoning and its factual findings were not clear error. Thank you. That will conclude the arguments for today. The court will recess until 9 o'clock in the morning. Thank you.